UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                    MASTER FILE NO. 12-md-02311

_____

In Re: Wire Harness Cases               HON. MARIANNE O. BATTANI

_____
                                        13-13055
THIS DOCUMENT RELATES TO:
                                        12-mdl-00104

_____/

**OPINION AND ORDER DENYING FUJIKURA LTD. AND FUJIKURA
AUTOMOTIVE AMERICA, LLC'S MOTION TO DISMISS THE COMPLAINT**

Before the Court is Defendant Fujikura Ltd ("F-Co") and Fujikura Automotive America LLC's ("FAA") (collectively "Fujikura Defendants") motion pursuant to Rule 12(b)(6) to dismiss Ford Motor Co.'s ("Ford") complaint (Doc. No. 21). The Court heard oral argument on February 12, 2013, and at the conclusion of the hearing, took this matter under advisement. For the reasons that follow, the motion is **DENIED**.

**I. RELEVANT FACTS**

Ford filed suit on July 16, 2013, alleging Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1. According to Ford, Defendants conspired "to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harness systems and related products ("Wire Harnesses"), from at least as early as January 2000 until at

least February 2010 (the "Conspiracy")." (Doc. No. 1 at ¶ 1). Wire Harnesses are "automotive electrical distribution systems used to direct and control electronic components, wiring and circuit boards." (Id.)

Ford alleges that "[d]uring the period of the Conspiracy," it spent more than "10 billion dollars in the direct purchase of Wire Harnesses in the United States and elsewhere." (Doc. No. 1 at ¶ 7). Ford contends that F-Co "targeted" Ford in three ways: it agreed not to compete for Ford business; it submitted rigged bids to Ford; and it agreed with its co-conspirators to "fix, stabilize, and maintain the prices of Wire Harnesses sold to Ford." (Id. at ¶ 7). Ford alleges that FAA, F-Co's wholly owned and/or controlled subsidiary, "manufactured, marketed and/or sold Wire Harnesses that were purchased throughout the United States, during the Conspiracy Period. (Doc. No. 1 at ¶ 16).

During the Conspiracy Period, Ford entered into contracts with Defendants' co-conspirators, including Sumitomo Electric Industries, Ltd. ("Sumitomo") and certain of its subsidiaries, and Yazaki Corporation ("Yazaki") and certain of its subsidiaries, for the purchase of Wire Harnesses. (Id. at ¶ 27). Also during that period, "Ford's purchasing team issued requests for quotations ("RFQs") to manufacturers of Wire Harnesses, including FAA and its co-conspirators." (Id. at ¶ 30). "An RFQ identifies the specifications of the Wire Harness to be produced, and requests a proposal from the supplier detailing the supplier's ability to manufacture and supply the Wire Harness, including information about cost, design, engineering, and logistics." (Id. at ¶ 31). RFQs for Wire Harnesses were either per model, a particular line of vehicles, or per platform, "a common set of structural, design, engineering and production parameters,

2

including major components such as the chassis, used for more than one model." (Id. at ¶ 32). "Because of the time necessary for the engineering and design of Wire Harnesses, Ford generally issued RFQs for the manufacture and supply of Wire Harnesses years before commencement of the manufacture of the vehicle model or platform covered by the RFQ." (Id.)

To better assess the bids submitted by potential suppliers, Ford developed a program that estimated the supplier's cost of production and a reasonable profit margin; however, the program's effectiveness was limited because the suppliers had to provide accurate information about parts, materials, labor, and other costs. (Doc. No. 1 at ¶ 34). In 2006, Ford instituted a requirement that suppliers identify the price of each Wire Harness component, and other related costs such as labor and overhead. (Id. at ¶ 35). FAA complied; its co-conspirator, Sumitomo did not. (Id. at ¶ 36). According to Ford, the program was flawed because some suppliers manufacture their own wire, preventing Ford from ascertaining the "actual costs to those suppliers of copper wire, one of the major input components in the manufacture of Wire Harnesses." (Id. at ¶ 37). "This lack of transparency provided Fujikura and its co-conspirators an opportunity to attribute inflated prices to input costs, and to conceal their conspiratorial manipulation of prices." (Id.)

The complaint also details an example of how the conspiracy worked. According to Ford, Fujikura Defendants and co-conspirators declined to bid, or submitted bids that were deliberately noncompetitive, in response to RFQs received from Ford relative to "the CD4 [a global platform used in Ford vehicles around the world] RFQ that Ford issued in March 2009." (Doc. No. 1 at ¶ 57).

3

> During the first round of bidding, [FAA] submitted a completely non-competitive bid, which included non-competitive price quotes for wire and labor. That bid achieved the intended objective of the members of the cartel -- [FAA] was not invited to participate in the second round of bidding.
>
> Fujikura's co-conspirator, Sumitomo Electric Wiring Systems, Inc. ("Sumitomo Electric Wiring"), a subsidiary of co-conspirator Sumitomo, pursuant to the agreement among the conspirators, refused to submit any bid. This refusal was based on the claim that the company was not interested in rapid growth and in assuming responsibility for a large volume of Wire Harness business. The disclosure of the Conspiracy underscores that this claim was pretextual.
>
> Because Fujikura and its co-conspirators subverted the CD4 RFQ bidding process, Ford agreed to pay, has paid, and is continuing to pay an artificially inflated and non-competitive price for CD4 Wire Harnesses.
>
> During the Conspiracy Period, Ford was damaged substantially as a result of the Conspiracy because it was forced to pay supra-competitive prices for the Wire Harnesses that Ford purchased from Fujikura's co-conspirators. This substantial harm was caused by, among other things, Fujikura and its co-conspirators': (a) submission of rigged bids in response to Ford's RFQs; (b) allocation of Ford's Wire Harness business; (c) fixing of prices charged to Ford for Wire Harnesses; and (d) limitation of the conspirators' production capacity resulting from their conspiratorial agreement not to bid on Ford business.

(Doc. No. 1 at ¶¶ 58-61).

Ford includes allegations about market concentration, barriers to entry, and inelasticity.

> Fujikura and its co-conspirators have dominated the Wire Harness market throughout the Conspiracy Period. In 2009, during the Conspiracy Period, the top four automotive Wire Harness suppliers controlled approximately 77% of the global market, and the top seven controlled approximately 88% of the global market.

(Doc. No. 1 at ¶ 41). In addition, Ford alleges the existence of high barriers to entry in the Wire Harness market "because of the requirement of large capital investments in plants, machinery and technical expertise." (Id. at ¶ 43).

4

> A new entrant into the Wire Harness market faces a lengthy and costly start-up process, requiring substantial capital costs associated with manufacturing plants and equipment, energy, transportation, a distribution infrastructure and skilled labor. A supplier also must develop the reputation that it has the capability to produce, over an extended period, the necessary volume of supply, meeting OEM [Original Equipment Manufacturer], regulatory and safety standards for quality and consistency.

(Id. at ¶ 44). Ford also alleges inelastic demand because wire harnesses are an essential component of the vehicle and account for a "relatively small fraction of the total vehicle cost." (Id. at ¶ 46). Thus, even after Defendants and their co-conspirators raised the prices far above the competitive level, the demand for Wire Harnesses was not affected. (Id.)

Ford includes allegations about Fujikura Defendants' opportunity to conspire at industry events where Fujikura Defendants and their co-conspirators could disguise their improper discussions about allocation of supply to Ford and coordinate price adjustments and place limitations on production capacity. (Doc. No. 1 at ¶¶ 49-52). Ford also alleges that Fujikura Defendants took measures to conceal their conduct, including using code names, meeting at different private residences, and monitoring the behavior of those involved.

In June 2012, F-Co pleaded guilty in the United States to conspiring to rig bids for, and to fix, stabilize, and maintain the prices of, Wire Harnesses sold to an automobile manufacturer in the United States and elsewhere, and was fined $20 million. F-Co's co-conspirators collectively have agreed to pay criminal fines of $670 million in the United States because of participation in the Conspiracy. (Doc. No. 1 at ¶ 5).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint which fails "to state a claim upon which relief can be granted."  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proven, would entitle him to relief.  First Am. Title Co. v. DeVaugh, 480 F.3d 438, 443 (6th Cir. 2007).  "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory."  Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997).   When reviewing a motion to dismiss,  the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.' "  Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## III. ANALYSIS

### A. Sufficiency of the Allegations

The parties disagree as to whether the allegations advanced by Ford satisfy Twombly.  In Twombly, the Supreme Court considered the pleading requirements

6

needed to withstand a motion to dismiss relative to a section 1 Sherman Act claim. It held that the complaint must contain enough factual matter to "plausibly suggest" an agreement:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

550 U.S. at 556. The conspiracy in Twombly did not satisfy Rule 8, Fed. R. Civ. P., because it was advanced through allegations of parallel conduct. The Supreme Court characterized allegations of parallel conduct as "naked assertion[s] of conspiracy." Id. at 557. It concluded that the complaint came "close to stating a claim, but without further factual enhancement it stop[ped] short of the line between possibility and plausibility of 'entitlement to relief.' " Id.

### 1. Limitation of Guilty Plea

Fujikura Defendants direct the Court to the admissions made by F-Co in its plea, specifically, to the difference between the admissions and Ford's allegations in order to show that Ford has not met its pleading obligations. Notably, F-Co pleaded guilty to antitrust conduct relative to Subaru, not Ford; to involvement limited to five products, not the ten products identified in Paragraph 23 of Ford's complaint; to conduct occurring from January 2006 through February 2010, not beginning as early as January 2000 until at least February 2010 as alleged in Paragraph 1 of Ford's Complaint. The distinctions between F-Co's admissions and Ford's allegations show that Ford's allegations amount to a "me too" antitrust claim. See In re Tableware Antitrust Litig.,

363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) (observing that "[t]he question is not whether the New York Attorney General has put defendants on notice of possible civil liability, but rather whether plaintiff's complaint has done so").  Fujikura Defendants conclude that Ford's reliance is misplaced, particularly given the lack of a connection between the other Wire Harness guilty pleas and investigations.  Not one of the guilty pleas in the Wire Harness cases mentions Ford.  Nor does the Japanese Fair Trade Commission ("JFTC") identify Ford as a target.  Finally, the first mention of Ford in a guilty plea involves a different component part.

Despite these distinctions and the lack of an explicit connection to Ford by other Wire Harness guilty pleas, the Court rejects Fujikura Defendants' characterization of Ford's allegations as amounting to "me too."   The lack of complete alignment between OEM targets, time periods, and products in the various guilty pleas is not disconcerting because Ford's allegations are not confined by the admissions, and Ford does not merely reiterate the allegations made by the direct purchaser plaintiffs in the purported class action wire harness case.  See in re High Fructose Corn Syrup Antitrust Litig., 295 F.2d 651, 664 (7th Cir. 2002); (Doc. No. 12-101).  Ford has not simply invoked the various governmental investigations or the guilty pleas of F-Co and its alleged co-conspirators to support its antitrust claim; it has undertaken its own inquiry and framed its complaint to reflect its theory of the conspiracy.   Therefore, the Court's analysis is not altered by the admissions in the various guilty pleas or the scope of the investigation undertaken by the Department of Justice.  In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d 987, 1012 (E. D. Mich. 2010) (citing In re Vitamins Litig., No. 99-197, 2000 WL 1475705 at *11 (D. D.C. May 9, 2000) (rejecting the "notion that the

guilty pleas and cooperation agreements and the class settlement foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."); In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 620 (N.D. Ga.1997) ("[T]he court is aware of no authority that requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment. To the contrary, several cases flatly reject that theory."). Here, Ford alleges that the fines imposed by the Japanese Fair Trade Commission ("JFTC") on F-Co and Yazaki cover misconduct spanning "from at least as early as July 2000 until at least February 2010–a period must longer than the one admitted to in the guilty plea. (Doc. No. 1 at ¶ 87). In addition, Ford includes allegations regarding Yazaki and Furukawa, co-conspirators, that pleaded guilty to misconduct involving ten related products from as early as 2000. (Doc. No. 1 at ¶ 68, 74-75).

Also, Ford has alleged that FAA submitted a bid in the first round of a bidding process, which Ford thought was competitive at the time, and that Ford excluded FAA from the second round of bidding. Even though FAA did not participate in the round from which a winning bidder was selected, the guilty pleas of Yazaki and Furukawa create an even stronger inference that FAA's bid was purposefully noncompetitive or submitted in furtherance of a conspiracy that included Ford. In sum, co-conspirators' guilty pleas, the government investigation, the bidding behavior, the structure and characteristics of the wire harness market, and the opportunities to collude, all establish that the pleading requirements set forth in Twombly are met. Although Fujikura Defendants observe that more details could have been alleged, such as the identities of

the other bidders with whom FAA conspired, the amounts of their bids, or which supplier Ford ultimately selected, such details are not mandated by the procedural rules or case law. Although the inclusion of these details would paint a more detailed picture of what is alleged to have occurred, Twombly does not require a perfect complaint, only a plausible one. Ford has brought a plausible antitrust claim–one that includes allegations beyond parallel conduct and naked assertions of conspiracy.

### 2. Purchasing Relationship

It is undisputed that Ford did not purchase Wire Harnesses from Fujikura Defendants. Nevertheless, the Court finds that the allegations advanced here permit an inference than Fujikura Defendants' conduct impacted the prices paid by Ford. See In re Microsystems, 608 F. Supp. 2d 1166, 1198-1204 (N. D. Cal. 2009). Ford alleges that Fujikura Defendants targeted Ford by agreeing not to compete for Ford business. (Doc. No. 1 at ¶ 7). In addition, Ford alleges that Defendants and co-conspirators (1) participated in meeting and communication to discuss bids and price quotations for wire harnesses to be submitted to Ford and whether to refrain from soliciting Ford business, (2) agreed to allocate the supply of wire harnesses sold to Ford among themselves, (3) agreed to coordinate price adjustments, (4) agreed to limit production capacity, (5) held meetings to monitor and police the agreed upon bids and prices, (6) took measures to maintain the secretive nature of their conduct, using code names and meeting at changing private residence and remote locations, and (7) agreed to decline to bid or submit deliberately noncompetitive bids in response to Ford's RFQs. (Doc. No. 1 ¶¶ 47-61, 107-09). Given the nature of the conspiracy alleged by Ford, it is not necessary for Fujikura Defendants to have supplied Ford directly. Ford purchased from

Defendants' co-conspirators, and if Ford is able to prove its allegations, Fujikura Defendants' "guilt is as great as that of" their co-conspirators from whom Ford did purchase wire harnesses. "If the agreement. . .was unlawful and tortious, each is responsible for the torts committed in the course of the illegal combination." City of Atlanta v. Chattanooga Foundry & Pipeworks, 127 F. 23, 26 (6th Cir. 1903) (citations omitted) aff'd sub nom. Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390 (1906). Therefore, Fujikura Defendants have themselves "participated in the benefits resulting from the" increased price paid by Ford. Id.; accord Paper Sys. Inc. v. Nippon Paper Indus., 281 F.3d 629, 634 (7th Cir. 2002) (members of cartel are jointly and severally liable for the cartel's "entire overcharge").

### 3. Alternative Rationale

The Court's conclusion is not altered by Fujikura Defendants' alternative rationale for the Wire Harness bidding conduct. Fujikura Defendants suggest that it is commercially reasonable for a company to decline to participate in the bidding process or to submit a high bid because the volume needed was too much for that company to handle. (Doc. No. 1 at ¶¶ 57, 59, 99). They conclude that the Ford's allegations are more consistent with a unilateral business decision by FAA to price its bid to cover the costs of the massive worldwide expansion of production that would have been required to supply Ford. The alternative rationale is strengthened by the fact that FAA supplied the detailed input costs data required by Ford. (Doc. No. 1 at ¶ 36). Moreover, the disclosure of cost data to Ford means Ford could have alleged the bid was out of line with FAA's true costs, but failed to do so. The bottom line is Fujikura Defendants have never supplied Ford, and FAA's bid did not prevent other suppliers from bidding for the

11

business.

Collusive bidders often resort to false justification for their refusal to submit competitive bids. Therefore, whether Fujikura Defendants' justification that the uncompetitive CD4 bid was because of the size of the global CD4 platform raises the issue of pretext, which must be decided on a summary judgment motion. Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 189-90 (2d Cir. 2012) (observing that "the plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct. Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible") cert. denied, 133 S. Ct. 846 (U.S. 2013). Ford's position is that FAA submitted a "completely noncompetitive bid, what included noncompetitive price quotes for wire and labor" to achieve the objectives of the cartel, including exclusion from further bidding. (Doc. No. 1 at ¶ 58). Fujikura Defendants' alternative explanation does not undermine the plausibility of the conspiracy. Ford need not rule out all possible innocent explanations.

In the alternative, Fujikura Defendants ask the Court to limit Ford's claim to FAA's bid on the CD4 platform. The Court declines to impose a limitation. Here, the purpose of the conspiracy in which Fujikura Defendants are alleged to have participated involved limiting and restricting the rights of Ford and other OEMs to solicit competition for business and increasing the price of wire harnesses. Consequently, the fact that Ford did not purchase wire harnesses from Fujikura Defendants does not doom its complaint, and the fact that FAA submitted a single bid in 2009 to supply wire

harnesses to Ford for a single platform, the CD4, (see Doc. No. 1 at ¶¶ 34, 57-60), does not limit the claims.

### B. Limitation on Discovery

Fujikura Defendants allege that because Ford only mentions contact with FAA in connection with the CD4 platform, the Court should limit discovery to bidding involving that platform. The Court declines to do so.

Ford did not limit Fujikura Defendants' conduct to the CD4 platform. Nor should it, in light of the JFTC's order for payment of a fine of 1.18 billion yen [$15.4 million] for misconduct as early as July 2000 (Doc. No. 1 at ¶ 87).

Further, Defendants' reliance on In re Florida Cement & Concrete Antitrust Litig, 746 F. Supp. 2d 1291 (S.D. Fla. 2010) (cement and concrete purchasers brought putative class actions against vertically-integrated cement companies, alleging unlawful price-fixing conspiracy), to support their position that discovery should be limited is misplaced. In Florida Cement, the plaintiffs relied on parallel conduct, government investigations, and market factors to show a conspiracy as well as some statements made by the president of one of the defendant companies. His first statement occurred in the summer of 2008. Specifically, after the company raised its price of ready-mix concrete by $25 per ton, the president stated to his sales staff that "competitors had agreed to go along with the increase. Id. at 1317. The president also told employees that arrangements had been made not to compete for another company's customers. In early 2009, the president made another statement, which, when viewed in the light most favorable to the plaintiffs, indicated the existence of some agreement regarding competition with a competitor. The court concluded that these statements did not

support a statewide, multi-defendant, two-product conspiracy, and it did not support a conspiracy beginning four years before the first statement was made.

Because the Twombly analysis turns on allegations that show something more than parallel conduct, and in this case, co-conspirators have admitted to conduct from as early as January 2000, it is distinguishable from the authority relief upon by Fujikura Defendants. Therefore, the Court denies Defendants' request to limit discovery.

## IV. CONCLUSION

For the reasons stated above, the motion is **DENIED**.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Date: March 4, 2014

### CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record via the Court's ECF Filing System.

s/Bernadette M. Thebolt
Case Manager